[Cite as *T.V. v. R.S.*, 2021-Ohio-2444.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| T.V., | : | |
| Petitioner-Appellee, | : | |
| | | No. 110049 |
| v. | : | |
| R.S., | : | |
| Respondent-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 15, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-933142

***Appearances:***

Flannery|Georgalis, L.L.C., Edward R. Fadel, and Mira Aftim, *for appellee.*

The Goldberg Law Firm and John J. Dowell, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Respondent-appellant, R.S., appeals from the trial court's judgment granting a civil stalking protection order to petitioner-appellee, T.V. R.S. contends the trial court erred in granting the order. Finding no merit to the appeal, we affirm.

## I.    Background

{¶ 2}    On June 8, 2020, T.V. filed a petition for a civil stalking protection order pursuant to R.C. 2903.214.  The trial court granted an ex parte temporary protection order and set the matter for a full hearing.  On July 7, 2020, a magistrate conducted a full hearing at which both parties and their counsel appeared.

{¶ 3}    T.V. testified that she and R.S. began dating in July 2019, and he became physically abusive after only a few months.  On one occasion, he grabbed her shirt, pushed her against the wall, and screamed in her face.  Another time, he pinned her on the bed, lifted her up, and then banged her head on the headboard.  T.V. said that R.S. was also mentally abusive.  He would show up when she was out with her friends to confirm who she was with, and tried to isolate her from her friends by telling her they were bad people and did not love her like he did.  T.V. said she broke off the relationship in October 2019, due to R.S.'s behavior, but that she and R.S. then went through a "transitional period" for a few months where they would sometimes hang out together and were occasionally intimate.

{¶ 4}    T.V. testified that during this "transition time" she continued to communicate with R.S. as a friend, hoping that his abusive behavior would stop.  Instead, it continued and intensified.  She said she blocked R.S.'s number from her phone, but he bought "burner phones" to conceal his identify so he could continue contacting her.[1]  T.V. said that if she went out with friends, R.S. would call "like 100

---

[1] T.V. said that R.S. knew that she had blocked his number because he sent her screen shots from his burner phone of texts that had been blocked.  He also sent her texts asking why she had blocked his number.  *See* Petitioner's exhibit No. 4.

times." He monitored social media posts of her friends and then called the people she was with. He would also show up uninvited at her apartment, and even let himself into her apartment several times while she was sleeping.

{¶ 5} Although R.S. initially told T.V. that he was able to get in her apartment because she had left the door open, he eventually confessed that he had made a copy of her apartment key. As a result, T.V. changed the locks to her apartment and installed a security system. She said that despite these measures, R.S. continued to show up unannounced at her apartment at all hours of the day and night, demanding to be let in. She said the unannounced visits scared her, and she began checking to make sure she did not see R.S.'s car in the parking lot when she left her apartment or came home from work.

{¶ 6} T.V. testified that in February 2020, R.S. contacted D., a man with whom she had been on several dates, and falsely accused him of raping her. D. terminated his relationship with T.V. as a result of the false accusation. R.S. texted T.V. about the man, using his friend's phone, and told her, "[i]t's [R.] I promise you and [D.] will pay * * * enjoy your night you garbage. I promise you will pay for this, both of you." Petitioner's exhibit No. 3. T.V. testified that in light of the threatening text and R.S.'s previous physical abuse, she believed that R.S. would harm her or D.

{¶ 7} T.V. testified that in early April 2020, she attended a party at the Pinnacle Condominiums. She said that R.S., who was also at the party, became aggressive and angry when she refused to speak to him, and one of his friends had to pull him outside. An hour later, R.S. began texting T.V., accusing her of sleeping

with one of the men at the party and telling her that "if you don't get ahold of me now your sh-- is going public I swear on everything." Petitioner's exhibit No. 12. T.V. said that she was on probation for a DUI conviction, and that R.S. would periodically threaten to email her probation officer and tell her that T.V. had violated the terms of her probation. T.V. interpreted this text as such a threat.

{¶ 8} In another text sent only a few minutes later, R.S. called T.V. a "whore" and told her "wanna play with me and f--- me and then put on a show, just wait." He also told her that he was going to kill himself. Petitioner's exhibit No. 12. On another occasion, R.S. sent T.V. a text stating that he was holding a gun to his head and asking her to "save" him. Petitioner's exhibit No. 14. T.V. testified that R.S. told her in March or April 2020, that he had purchased a firearm.

{¶ 9} T.V. testified that she texted R.S. on April 14, 2020, and told him that she would seek a restraining order if he did not stop harassing her. However, over several days in early May, R.S. sent T.V. texts asking if he could speak with her because he wanted to tell her "something good." Petitioner's exhibit No. 13. T.V. testified that when she did not respond to the texts, R.S. showed up unannounced at her apartment on May 9, 2020. He cried as he apologized to her, and promised he would stop his harassing behavior if they could be friends. He even offered to pay her $500 a month to be his friend. T.V. said that she believed R.S.'s promise, unblocked his phone number from her phone, and gave him another chance at being friends.

{¶ 10} A week later, T.V. was at Lago East Bank on May 16, 2020, with friends and walked by R.S. but did not speak to him. She said that after R.S. saw her, he texted her repeatedly for over an hour, asking her to "come say hi to me * * * I won't make it weird I swear * * * I promise." Petitioner's exhibit No. 5. T.V. said she did not respond to the texts, and then, when R.S. observed her speaking to a man named J.B., he approached them and started yelling so loudly that "people had to pull him back."

{¶ 11} After the incident, the tone of R.S.'s texts to T.V. changed. He told her that "[y]ou are f---ing disgusting. I swear to you the truth is coming now." Petitioner's exhibit No. 5. He then continued to text her until the early hours of the morning, telling her, among other things, to "[g]et ready for a long week. I'm going to enjoy every f---ing minute of this! I know you think I won't cause I've shown restraint in the past but I swear to you I'm going to ruin both of you!" Petitioner's exhibit No. 5. T.V. testified that she did not respond to any of the texts, but realized after this incident there was "no way" she could be friends with R.S.

{¶ 12} J.A., a friend of T.V., testified that she observed the interaction between R.S. and J.B. at Lago on May 16, 2020, and was concerned that R.S. was going to hurt T.V. or J.B. T.V.'s boyfriend, A.G., testified that after the Lago incident, T.V. was "completely just scared out of her mind, just distraught, and she just didn't look right emotionally."

{¶ 13} On May 23, 2020, T.V. went to the Ivy bar for a friend's birthday party; R.S. was there. A male friend of T.V.'s, A., was also there. After saying hello

to R.S., T.V. went to another area of the bar. R.S. then texted her, "I swear to god if I hear one f---ing word you're with A. it's gonna be bad." Petitioner's exhibit No. 6. T.V. testified that after receiving this text, she believed that R.S. would physically harm her and A.

{¶ 14} T.V. testified that she was at her friend's pool on May 25, 2020, when her friend posted a photograph of her on Instagram. R.S. saw the photograph, sent it to T.V. from a burner phone, and texted, "I see [A.G.] in the back. I swear to god I know now. You piece of sh--. I promise you as much fun you think you're having, wait til tomorrow. I swear to god next time I see [A.G.] it's done for him too, you can show him this." Petitioner's exhibit No. 7. R.S. continued sending threatening texts to T.V., stating "I swear to you you're both f---ing in for it * * * I swear to god he's getting this * * * I swear to you it's my f---ing mission to make you pay for this you f---ing loser piece of sh--." Petitioner's exhibit No. 8.

{¶ 15} T.V. testified that upon receiving these texts, she began shaking and crying because she believed that R.S. would hurt her and A.G. She said that R.S. called her later that week and when she answered the phone, he screamed that he would kill both her and A.G. if he found out they were in a relationship.

{¶ 16} T.V. testified that on May 27, 2020, R.S. again appeared unannounced at her apartment and demanded to be let inside. The following week, fearing for the safety of herself and others, she filed a police report.

{¶ 17} A day or two later, T.V. saw R.S. at Club FWD. After she left, he texted her that "I swear to you on my life you looked so cheap * * * you and [A.G.] look like

idiots * * * just so you know [A.G.] is scared of me." Petitioner's exhibit No. 10. T.V. saw R.S. at Club FWD again on June 28, 2020, after the temporary restraining order had been put into effect. T.V. said that the staff asked him to leave, but he refused to do so. Two hours later, after the police arrived, R.S. snuck out the back to avoid confrontation. A.G., who was with T.V. at the club, testified that T.V. was very "shaken up" by R.S.'s presence.

{¶ 18} T.V. testified that as a result of R.S.'s harassment, she cannot eat or sleep and cries regularly, even hiding in the bathroom at work to cry. She also said that in light of R.S.'s threats, she believes he will hurt her. She testified further that she planned to start seeing a therapist.

{¶ 19} A.G., T.V.'s boyfriend, testified that he started dating T.V. in early 2020. He said that on the nights he was with T.V., he observed R.S. calling and texting her "nonstop." He said the texts were demeaning, and T.V. cried after reading them. He said that one night when R.S. kept calling T.V. repeatedly, T.V. put one of the calls on speaker phone, and he heard R.S. "screaming, yelling, I know you're dating [A.G.] and if I see you out with him I'll kill you both." A.G. said that T.V. was "scared out of her mind" after this call.

{¶ 20} T.V.'s friend J.A. testified that T.V. became "like a shell of herself" when she was dating R.S. because he was so controlling. She said that on one occasion, she observed R.S. at Club FWD staring at T.V. as if he were "trying to intimidate her and scare her." She also described an incident that occurred one evening when she was staying at T.V.'s apartment. She said that R.S. showed up

unexpectedly, and as T.V. and R.S. were arguing outside the door to the apartment, she heard T.V. tell R.S., "you choked me until I lost consciousness." J.A. said that upon hearing this, she opened the door and grabbed T.V., pulling her back inside, and when R.S. tried to push his way into the apartment, she used the door to push him out.

{¶ 21} After the hearing, the magistrate issued a decision granting a five-year civil stalking protection order against R.S. He subsequently filed objections to the magistrate's decision. The trial court overruled the objections and adopted the magistrate's decision. This appeal followed.

## II. Law and Analysis

{¶ 22} R.C. 2903.214 allows a victim of menacing by stalking to obtain a civil stalking protection order. To obtain such an order, the petitioner must establish by a preponderance of the evidence that the respondent's conduct violated the menacing by stalking statute. *E.J.V. v. S.R.*, 8th Dist. Cuyahoga No. 108615, 2020-Ohio-1612, ¶ 12. We review the decision to grant a civil protection order for an abuse of discretion. *N.P. v. T.N.*, 8th Dist. Cuyahoga No. 106314, 2018-Ohio-2647, ¶ 20, citing *Williams v. Flannery*, 8th Dist. Cuyahoga No. 101880, 2015-Ohio-2040, ¶ 6.

{¶ 23} "Menacing by stalking" is defined in R.C. 2903.211, which provides in relevant part that "[n]o person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person."

{¶ 24} "Pattern of conduct" is defined as "two or more actions or incidents closely related in time." R.C. 2903.211(D)(1). The period in which the incidents must occur to be considered "closely related in time" is a matter to be determined by the trier of fact on a case-by-case basis. *W.P.C. v. S.R.*, 8th Dist. Cuyahoga No. 108613, 2020-Ohio-3178, ¶ 13.

{¶ 25} "Mental distress" is defined as including "any mental illness or condition that involves some temporary substantial incapacity" or "any mental illness or condition that would normally require * * * mental health services," even if the person did not request such services. R.C. 2903.211(D)(2). Expert testimony is not required to establish mental distress, and the trier of fact may rely on its own knowledge and experience in determining whether the respondent's conduct caused mental distress. *R.R. v. J.H.*, 8th Dist. Cuyahoga No. 109465, 2021-Ohio-706, ¶ 29, citing *State v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, ¶ 18 (4th Dist.). Furthermore, "'the testimony of the victim herself as to her fear is sufficient to establish mental distress.'" *Id.*, quoting *State v. Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 48.

## A. Sufficiency of the Evidence

{¶ 26} In his first assignment of error, R.S. contends that the evidence was insufficient to establish that he knowingly caused T.V. to believe that he would cause her physical harm or that he caused her mental distress. [2]

---

[2] R.S. concedes that he engaged in a pattern of conduct regarding T.V. *See* Respondent's Brief, p. 5.

{¶ 27} Appellate review on the issues of sufficiency and manifest weight of the evidence in civil cases is the same as in criminal cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E. 2d 517, ¶ 17. Under the sufficiency standard, appellate courts review the evidence presented in the light most favorable to the appellee to determine whether the appellee presented some evidence going to all elements of the claim or offense. *Vega v. Tomas,* 8th Dist. Cuyahoga No. 104647, 2017-Ohio-298, ¶ 9.

{¶ 28} T.V. testified repeatedly that she believed R.S. would physically harm her, especially in light of his physical abuse during their relationship. She said that after he texted her in February 2020, about her and D., she believed that he would harm her or D. She said that after receiving R.S.'s texts on May 23, 2020, about her and her friend A., she believed that R.S. would physically harm her and A. She testified that after receiving R.S.'s texts on May 25, 2020, about her and A.G. threatening that "you're both f---ing in for it," she started crying and shaking because she believed that R.S. would hurt her and A.G. She testified that later that week, she received a phone call from R.S. telling her that he would kill her and A.G. if he found out they were in a relationship. She testified further that she finally made a police report about R.S. in early June 2020, because she feared for her physical safety and that of others.

{¶ 29} The evidence could not be more compelling that R.S.'s actions caused T.V. to fear that R.S. would physically harm her. Moreover, T.V.'s fear was

reasonable: not only did R.S. physically abuse her during their relationship, he also told her that he had purchased a gun.

{¶ 30} With respect to mental distress, R.S. contends the evidence was insufficient to establish that his pattern of conduct caused T.V. mental distress because she was able to continue her daily life, including going out to parties and clubs, and continued to be intimate with him until May 2020. He also asserts that T.V. sent him a text on April 28, 2020, in which she advised him that she was at her parents' home, a text he contends is "unusual behavior" for someone who is fearful of him. Finally, he argues that T.V. did not experience mental distress as a result of his actions because at the time of the hearing, she was not undergoing counseling or taking medication for her emotional distress. R.S.'s arguments are without merit.

{¶ 31} First, although T.V. agreed at the hearing that she was not currently seeing a therapist, she testified that she intended to do so. Moreover, it is not required "that a person requested or received psychiatric treatment, psychological treatment, or other mental health services in order to show that the person was caused mental distress[.]" R.C. 2903.211(E).

{¶ 32} The record also reflects that T.V. denied being intimate with R.S. at any time in May 2020, and testified that the text to R.S. about her mom was meant for someone else and sent to R.S. inadvertently. Furthermore, "[i]n a sufficiency analysis, we do not consider the credibility of witnesses or whether the evidence is to be believed, but whether, if believed, the evidence against a [respondent] would

support a [civil stalking protection order]." *State v. Philpott*, 8th Dist. Cuyahoga Nos. 109173, 109174, and 109175, 2020-Ohio-5267, ¶ 60.

{¶ 33} Our review of the record demonstrates that, if believed, the evidence was sufficient to establish that T.V. suffered mental distress as a result of R.S.'s pattern of conduct. A.G. testified that he observed T.V. crying "over and over again" after she read R.S.'s texts, and said that T.V. would "shut down" and sometimes not talk for a day after she read them. T.V. testified that R.S.'s unannounced visits "scared" her so she now scans the parking lot for R.S.'s car when she goes to work and when she returns in order to avoid him. She said she rushes into her apartment after she returns home, and does not feel comfortable even checking for her mail. She testified that as a result of R.S.'s harassment, she cries regularly, even hiding in the bathroom at work to cry; cannot eat or sleep; and is planning on seeing a therapist.

{¶ 34} Such testimony is sufficient to demonstrate mental distress. *See, e.g.*, *R.G. v. R.M.*, 7th Dist. Mahoning No. 17 MA 0004, 2017-Ohio-8918, ¶ 30 (hypervigilance can be viewed by a reasonable factfinder as a mental condition that would normally require mental health services); *Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208 at ¶ 48 (lack of sleep or inability to concentrate at work can support a finding of temporary substantial incapacity under R.C. 2903.211(D)(2)(a)); *Middleton v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, 856 N.E.2d 1003, ¶ 8 (12th Dist.) (testimony that petitioner felt nervous, frightened, upset, and scared was sufficient to support a finding of mental distress).

{¶ 35} Finally, the evidence was sufficient to establish that R.S. acted knowingly to cause T.V. fear of physical harm and mental distress. A person acts knowingly when "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22. The offender's subjective intent is not relevant under R.C. 2903.211. *A.V. v. McNichols*, 4th Dist. Hocking No. 18CA17, 2019-Ohio-2180, ¶ 19. "Instead, the issue is whether the offender acts when he is aware that his conduct will probably cause mental distress, regardless of whether it was his purpose to cause that result." *Id.*

{¶ 36} The record contains sufficient evidence that R.S. was aware that his actions would cause T.V. mental distress and fear of physical harm. He knew that she did not want him to text her and that she had blocked his number, but he bought "burner phones" so he could continue texting and calling her "nonstop," against her wishes. He sent her threatening texts and threatened to kill her and her boyfriend, despite his promise that he and T.V. would be friends. He also showed up uninvited and unannounced at T.V.'s apartment and demanded to be let in, over her objections. R.S.'s actions are sufficient to demonstrate that he knew his actions would likely cause T.V. mental distress and fear of physical harm.

{¶ 37} Construing the evidence in a light most favorable to T.V., as we are required to do in a sufficiency analysis, we find that the evidence was sufficient to establish that R.S. committed acts against T.V. that constituted menacing by stalking under R.C. 2903.211. The first assignment of error is therefore overruled.

### B. Manifest Weight of the Evidence

{¶ 38} In his second assignment of error, R.S. contends that the civil stalking protection order was against the manifest weight of the evidence. Under the manifest weight standard, appellate courts must "'weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 20, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 39} R.S. contends that the protection order was against the manifest weight of the evidence because the witnesses were not credible and their testimony was inconsistent. He argues that despite her testimony that R.S. was harassing her, T.V. admitted that even after the relationship ended completely in January 2020, she and R.S. spent time together eating food from Uber Eats, and played games on their phones against each other. He also asserts that despite testimony that he showed up uninvited to T.V.'s apartment one morning in January 2020, there was evidence that T.V. had called him and left a message in which she said she wanted to talk to him to apologize for her drunken behavior the night before. He further contends that T.V. was "vague" and "deceitful" to the court and her friends about when her relationship with R.S. actually ended.

{¶ 40} Decisions regarding credibility fall within the province of the trier of fact. *R.R. v. J.H.*, 8th Dist. Cuyahoga No. 109465, 2021-Ohio-706 at ¶ 23, citing *Nguyen v. Chaffee*, 7th Dist. Columbiana No. 08 CO 35, 2009-Ohio-3352, ¶ 8. The trier of fact may take note of any inconsistencies in the testimony and resolve them accordingly; it is free to accept or reject any or all of the testimony of any witness. *State v. Wilkinson,* 8th Dist. Cuyahoga No. 100859, 2014-Ohio-5791, ¶ 39. Here, the trial court, as the factfinder, was able to listen to each witness and judge their credibility. It was within the trial court's province as factfinder to believe T.V., especially given the testimony of J.A. and A.G., who corroborated her testimony and observed her mental distress. Our review of the record reveals nothing to suggest that we should not defer to the credibility determinations made by the trial court.

{¶ 41} Upon our review of the record and taking everything into consideration, we find that despite any inconsistencies in the testimony, T.V. demonstrated by a preponderance of the evidence that R.S. knowingly engaged in a pattern of conduct that caused her to believe he would physically harm her, and that as a result, she suffered mental distress. Accordingly, the trial court did not abuse its discretion in granting the civil stalking protection order.

{¶ 42} The second assignment of error is overruled.

**C. Text Messages**

{¶ 43} At the full hearing, T.V. identified and testified about thirteen exhibits that were screen shots of text messages R.S. sent to her. In his third assignment of error, R.S. contends that the trial court erred in allowing this testimony and in

admitting the exhibits into evidence because the exhibits were not properly authenticated. R.S. concedes that the magistrate's decision, which was adopted by the trial court, specifically stated that the text messages were not considered in the decision, but contends that "the volume of testimony relating to the text messages that were admitted into evidence is overwhelming and cannot be ignored."

{¶ 44} To be admitted into evidence, a document must be authenticated. Under Evid.R. 901(A), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This threshold standard is low. It does not require conclusive proof of authenticity; rather, the required basis is sufficient foundational evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be. *State v. Jaros*, 6th Dist. Lucas No. L-10-1101, 2011-Ohio-5037, ¶ 15. The admission or exclusion of evidence is within the trial court's discretion, and a reviewing court will not reverse the trial court's decision absent an abuse of that discretion. *State v. Lenard*, 8th Dist. Cuyahoga No. 105998, 2018-Ohio-3365, ¶ 20.

{¶ 45} R.S. concedes that T.V. authenticated the exhibits by testifying that they were screenshots of texts he sent to her and that she knew the texts came from him because he is the only person who talks to her that way. He argues, however, that T.V.'s testimony that she deleted two explicit photographs of herself from Petitioner's exhibit No. 8 calls into question the authenticity of all of the exhibits and

that accordingly, all of petitioner's exhibits should have been excluded. R.S.'s arguments are without merit.

{¶ 46} First, this was a hearing to the bench and we presume the trial judge rendered a decision on the proper evidence. *State v. Atwater*, 8th Dist. Cuyahoga No. 107182, 2020-Ohio-484, ¶ 15. The trial court specifically stated that it did not consider the text messages in rendering its decision, and we presume that to be true. Our review of the record demonstrates that, as the trial court found, there was overwhelming evidence even without the text messages that R.S. violated the menacing by stalking statute against T.V. The assignment of error can be overruled on this basis alone.

{¶ 47} Moreover, there is no merit to R.S.'s argument that the redaction of two explicit photographs from a single exhibit affected the admissibility of that exhibit, let alone all the exhibits. In *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, the Ohio Supreme Court considered the defendant's argument that a notebook from which four pages were missing had not been properly authenticated and was thus inadmissible. *Id.* at ¶ 113. The Supreme Court found that the witness testified that he had written the notes, the notebook was in the same condition as when he wrote them, and he did not recall what happened to the missing pages. *Id.* The court concluded that nothing in the record demonstrated that the missing pages "altered the writing on the portion that was admitted," and that the witness's testimony was sufficient to support a finding that the matter in question was what its proponent claimed it to be. *Id.* at ¶ 115. Accordingly, the court

found that the missing pages did not affect the authentication or admissibility of the notebook, reasoning that "[w]hile the missing pages may have affected the evidentiary weight of the notebook to be accorded by the jury, their absence did not render the notebook inadmissible." *Id.* at ¶ 116.

{¶ 48} This case is similar to *Myers*. T.V. testified that Petitioner's exhibit No. 8 was a screenshot of texts sent to her from R.S. but that due to privacy concerns, she had removed two explicit photographs of herself that would otherwise have been included in the screenshot. She identified the location in the conversation of the redacted photographs. We find nothing in the record that demonstrates the missing photographs altered the content of the remaining text messages in the exhibit. Accordingly, we conclude, as in *Myers*, that the missing photographs did not affect the authentication or admissibility of that exhibit or the other exhibits. Although the missing photographs may have affected the evidentiary value of the exhibit or of the other exhibits, they did not affect their admissibility. Accordingly, as the trial court found, the exhibits were properly authenticated and admitted.

{¶ 49} The third assignment of error is overruled.

{¶ 50} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., P.J., and
EILEEN T. GALLAGHER, J., CONCUR