[Cite as *Tabak v. Goodman*, 2022-Ohio-1123.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

SUSAN TABAK,

Petitioner-Appellee,

v.

KEITH GOODMAN,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0042**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2021 CV 00216

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*No Brief Filed* for Petitioner-Appellee and

*Atty. James S. Gentile*, The Liberty Building, 42 N. Phelps Street, Youngstown, Ohio 44503 for Respondent-Appellant..

Dated: March 31, 2022

**Robb, J.**

**{¶1}** Respondent-Appellant Keith Goodman appeals the decision granting Petitioner-Appellee Susan Tabak's Petition for a Civil Stalking Protection Order. For the following reasons, the trial court's decision is affirmed.

<u>Statement of the Facts and Case</u>

**{¶2}** On February 3, 2021, Appellee filed a Petition for a Civil Stalking Protection Order against Appellant. That same day, the magistrate granted an ex parte Civil Stalking Protection Order. A full hearing was held February 18, 2021, after which the magistrate granted the petition and issued a five-year Civil Stalking Protection Order. (2/22/21 Magistrate's Order.) In the order, the magistrate stated:

> The Court finds the Respondent has contacted the Petitioner on numerous occasions despite being told to have no contact. The Respondent did testify to mitigating factors such as contact initiated by Petitioner but those factors do not outweigh the necessity for a protection order. The Court finds Petitioner by a preponderance of evidence, has sustained her burden * * *."

**{¶3}** The magistrate then checked the box stating:

> The Court finds by a preponderance of the evidence that 1) Respondent has knowingly engaged in a pattern of conduct that caused Petitioner to believe that the Respondent will cause physical harm or cause or has caused mental distress; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from stalking offenses.

(2/22/21 Magistrate's Order.)

**{¶4}** Appellant filed objections and asserted there was no evidence of a pattern of conduct and no evidence of mental distress. Appellee asserted in her reply that there was a pattern of conduct and that he caused mental distress.

<u>Case No. 21 MA 0042</u>

**{¶5}** The trial court adopted the magistrate's decision after independently reviewing the objections. (4/13/21 J.E.) Appellant appealed.

<u>Assignment of Error</u>

"The Magistrate erred, abused his discretion and improperly granted the CSPO as the elements of menacing by stalking [have] not been demonstrated by some competent, credible evidence."

**{¶6}** Appellant contends the protection order should not have been granted. Thus, we apply a manifest weight of the evidence standard of review. *D.R.B. by K.G.B. v. G.T.B.*, 7th Dist. Noble No. 17 NO 0452, 2018-Ohio-2787, ¶ 8.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [finder of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic.) [*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541], quoting Black's at 1594.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12. When evaluating whether a decision is contrary to the manifest weight of the evidence, every reasonable presumption must be made in favor of the judgment. *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3 (and if the evidence is susceptible to more than one construction, the court of appeals must interpret the evidence in a manner consistent with the judgment).

**{¶7}** Here, the civil stalking protection order was filed in accordance with R.C. 2903.214(C)(1). Pursuant to that statute, the issuance of a civil stalking protection order requires the petitioner to establish a violation of R.C. 2903.211–menacing by stalking. "Menacing by stalking" means engaging in a pattern of conduct that knowingly causes another "to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person * * *." R.C. 2903.211(A)(1).

{¶8} "Pattern of conduct" is defined in R.C. 2903.211(D)(1) as "two or more actions or incidents closely related in time." The term "mental distress" is defined by R.C. 2903.211(D)(2) to mean:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶9} "Mental distress need not be incapacitating or debilitating." *Joy v. Letostak*, 10th Dist. Franklin No. 14AP-1040, 2015-Ohio-2667, ¶ 25. "Explicit threats are not necessary to establish menacing by stalking under R.C. 2903.211." *Bartells v. Bertel*, 12th Dist. Butler No. CA2016-11-216, 2018-Ohio-21, ¶ 56, citing *Lundin v. Niepsuj*, 9th Dist. Summit No. 26015, 2014-Ohio-1212, ¶ 19. It is instead the "duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions." *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, 856 N.E.2d 1003 ¶ 7 (12th Dist.). In making this determination, the trial court "may rely on its knowledge and experience in determining whether mental distress has been caused." *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 18 (4th Dist.). Therefore, although mental distress need not be shown to any level of professional certainty, it must nevertheless "be proven by facts introduced at trial and the reasonable inferences springing from those facts." *Cleveland Hts. v. Lewis*, 8th Dist. Cuyahoga No. 79511, 2002-Ohio-2736, ¶ 22.

{¶10} The testimony establishes that Appellee and Appellant were friends, but their friendship ended for a number of months and then restarted. (Tr. 5-6, 44.) Appellee testified the friendship stopped because Appellee thought Appellant was becoming obsessed with her. However, the friendship then resumed until once again Appellee felt Appellant was becoming obsessed with her.

{¶11} Susan Tabak testified she met Appellant in 2019, but in August 2019 she blocked him on her phone. (Tr. 5.) She testified he continued to attempt to contact her

despite being blocked.  (Tr. 5.)  In February 2020, she told him to stop contacting her.  (Tr. 6.)  She indicated that between February 2020 and June 2020 she did not talk to him, but he continued to leave her daily voice messages.  (Tr. 7.)  During that time she had a baby.  (Tr. 8.)  On her birthday, he left a gift by her mailbox and wrote in the card that he knew about her daughter and wanted to be a support system for her and her child.  (Tr. 8.)  She then restarted their friendship.  (Tr. 8.)  She permitted him to watch her daughter a few times, but she explained that this stopped when he made comments to the child that he was her dad.  (Tr. 8.)

**{¶12}** It is clear from the testimony that Appellee and Appellant had differing opinions of their relationship.  Appellee claimed they were friends; he was 65 years old and she was 36 years old.  (Tr. 59.)  She explained that she thought of him as a father figure and that they never had a physical relationship.  (Tr. 59, 61.)  Appellant, however, testified that he was her boyfriend and there was a physical relationship.  (Tr. 50.)

**{¶13}** Appellee explained that Appellant convinced one of her friends to meet with him to get information about her.  (Tr. 9.)  He continually texted and called this friend until the friend also blocked his calls.  Appellee further explained:

From September 2020 to January 2021 I did talk to him on Messenger several times but it was like we had to be friends or get together or hang out or he would just show up at my house unannounced.  And at first, I thought he was just an innocent – I just thought he was, you know, a friend; he could be a support system for me; but it became to the point where he was obsessed like more so than like my parents were when I was a child wanting to know all my whereabouts, where I went.  When I didn't answer him, he would come to my house several times.  He would knock on my front door.  He would also go around to my back patio door and knock for 10 minutes yelling my name.  At that time, I pretended I wasn't home.

Last month, in January, I told him through Messenger that I wanted just a relaxing weekend at home.  I left the house a couple times to do errands, and he left a note, which I brought with me, angry that I wasn't home, saying that I was lying about going out, and that he told me on the phone that he

wrote down the times he came to my house and the times that I wasn't home.

I'm nervous because not only did he give people my phone number, he gave friends of his my address. One example is * * *. He asked her to drive by my house one time at 10 o'clock to see if I had company.

He's also told me that he would monitor if my ex-boyfriend was at my house, and that he drove by my house at like 10 o'clock at night and at midnight to see if there were cars in my driveway. Once he followed me all the way to my ex-boyfriend's house in Pennsylvania, which is 45 minutes away, in Sharon. He drove – followed me that far.

(Tr. 9-10.)

{¶14} She further explained he would come to her house multiple times a day when she quit talking to him. (Tr. 24.) He would leave multiple voice mail messages and have other people drive by her house multiple times a day. (Tr. 24.) She also indicated he made an additional Facebook account to try to contact her after she had blocked his account. (Tr. 26.)

{¶15} She was asked if Appellant ever threatened her physically. (Tr. 14.) She responded no, but indicated she is afraid if she does not get a protection order that he will continue contacting her and leaving voicemails, even though she has asked him to stop. (Tr. 14.) She said she is afraid. (Tr. 15.) She also testified:

I don't want him in trouble. I don't want any ill will. He's a very good guy. I think he's obsessed with me. I think he's in love with me. I just want to be left alone and to move on with my life. I shouldn't have to worry about having my mom come over. I shouldn't have to worry about him driving by my house or showing up at my house, and I'm afraid if it doesn't get extended, he's going to still contact me.

(Tr. 63.) en

{¶16} Appellee called a friend to testify on her behalf. This friend explained that Appellant sought information about Appellee, and the friend instead tried to convince Appellant to find someone his own age. (Tr. 32-33.)

{¶17} Admittedly, Appellee contacted Appellant some of the time, and the evidence confirms this. (Tr. 17, 47.) She went to his apartment and called him approximately 27 times one day before filing the petition. (Tr. 18, 20, 47.) Appellee claimed she was fearful Appellant would contact her ex-boyfriend who was abusive to her; he told her he was going to contact the ex-boyfriend. (Tr. 19, 23.) Although she buzzed to get into his apartment complex, he did not let her in. She got through security, and knocked on his door but he would not let her in. (Tr. 19, 20.) The weekend before she filed the petition for a protection order, they went to Hartville for the day. (Tr. 48.)

{¶18} Appellant claimed he told Appellee he would call the police and file a report about her ex-boyfriend because she had told him that the ex-boyfriend had recently hit her. (Tr. 49.) He further explained:

> I told [Suzie] I'll come shovel your driveway off. I'm going to call the police and file the report about the fact that she was hit by [ex-boyfriend]. This person's dangerous. I did like any other boyfriend would do. At that time she tried calling me 27 times. I literally blocked the phone. I was tired of – quite frankly, tired of her not telling me the truth in past experiences, and this is a point to where I said enough is enough, what's going on.

(Tr. 50.)

{¶19} He stated he did not make an additional Facebook account and explained instead that his account was hacked. (Tr. 54.) He also denied contacting her family and friends to get information about her. (Tr. 55.)

{¶20} Because the testimony presents a he-said-she-said situation, the trial court was in the best position to judge credibility and determine whether to believe Appellant or Appellee. Appellee's testimony detailing him continually calling and driving past her house demonstrates a pattern of conduct. She also said she was worried about him coming to her house and calling her and that she was afraid. Her entire testimony about their relationship, if believed, is sufficient to find that Appellant caused her mental distress

based on his repeated calls, contacting her friends to get information about her, and repeatedly driving past her house. The trial court concluded that although there were mitigating factors, such as Appellee contacting Appellant, those factors did not outweigh the need for the protection order, which is supported by the evidence.

**{¶21}** Given the deference we must afford the trial court's judgment, as well as its credibility determinations when presented with conflicting evidence, Appellant's sole assignment of error lacks merit and is overruled. The trial court's decision is affirmed.

Donofrio, P J., concurs.

D'Apolito, J., concurs.

Case No. 21 MA 0042

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**