[Cite as *J.S. v. Conkle*, 2024-Ohio-2330.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

J.S.,

Petitioner-Appellee,

v.

SARAH CONKLE,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0108**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CV 01408

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Matthew C. Giannini* and *Atty. Jennifer Boyle Beck,* for Respondent-Appellant.

Dated:  June 17, 2024

**DICKEY, J.**

**{¶1}** Appellant, Sarah Conkle, appeals from the September 11, 2023 judgment of the Mahoning County Court of Common Pleas overruling her objections and adopting a magistrate's decision granting Appellee's, J.S., Petition for a Civil Stalking Protection Order ("CSPO"). On appeal, Appellant asserts the trial court erred in granting the CSPO against the manifest weight of the evidence. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

**{¶2}** On July 20, 2023, Appellee filed a Petition for a CSPO against Appellant pursuant to R.C. 2903.214. The trial court granted an ex parte CSPO that same day.

**{¶3}** A full hearing was held on August 8, 2023. Both parties were present and unrepresented by counsel.

**{¶4}** Appellee presented seven exhibits: (1) a post in which Appellant stated, "I already have 9mm glocks and a .308 rifle. I practice with them and if Dan [(Appellant's ex-husband and Appellee's boyfriend)] decides he wants to be violent, or wants to pay someone to be, I'll be ready" (Petitioner's Exhibit 1); (2) Appellant posted that Appellee was stalking her Facebook page (Petitioner's Exhibit 2); (3) Appellant posted "HerScan Breast Cancer Ultrasound Screening," stating "What does [J.S.] have to do with this?" (Petitioner's Exhibit 3); (4) a post in which Appellant talked about her ex-husband (Dan) and his girlfriend (Appellee), including statements that "People have died because of things I prayed," and "be careful, Do you really want to test me?" (Petitioner's Exhibit 4); (5) Appellant posted a picture of the universe, stating "I CAN call down another mass plague like in 2020, but I didn't think you liked when I took matters in my own hands" (Petitioner's Exhibit 5); (6) Appellant's post included the hashtag "#[J.S.]"; mentioned her explanation of "truth"; mentioned J.S.; said "whoever woke me up is going to die"; prayed that Dan and J.S. feel "excruciating pain"; said "[J.S.] is such a crazy butch [sic] to my kids"; stated "Apparently [J.S.] is still a bitch?", and "[J.S. is] so messed up" and "a Cancer woman" (Petitioner's Exhibit 6); and (7) Appellant's post saying, "Life is really weird and karmic"; "My ex-husband['s] girlfriend had a double mastectomy"; "I am a psychic"; "Yes,

I own guns"; "I have guns"; "Bitch is crazy and accusing me of everything she does herself." (Petitioner's Exhibit 7).

**{¶5}** Appellee testified she has been dating Appellant's ex-husband, Dan Canton, for the past eight years. (8/8/2023 CSPO Hearing Tr., p. 10). Appellee has known Appellant since 2016. (*Id.*) Appellee said Appellant threatened her household via a Twitter post on June 9 in which she stated:[1] "I already have 9mm glocks and a .308 rifle. I practice with them and if Dan decides he wants to be violent, or wants to pay someone to be, I'll be ready." (*Id.* at p. 11-12); (Petitioner's Exhibit 1).

**{¶6}** In February 2018, Appellant went to Appellee's and Dan's home. (*Id.* at p. 14). Appellant and Dan share custody of their children. (*Id.* at p. 14-15). During the drop-off, Appellant started yelling and screaming and refused to leave. (*Id.* at p. 15). Because Appellant was "in [Appellee's] face," Appellee wanted to call the police. (*Id.*) Appellant "flipped [her] off" and Appellee punched Appellant in the head. (*Id.*) Appellee did not get charged with assault. (*Id.*) Appellant filed for and was granted a three-year CSPO against Appellee at that time. (*Id.* at p. 14).

**{¶7}** Appellant subsequently posted personal information about Appellee on social media platforms. (*Id.* at p. 16). Appellee did not become personally aware of the postings until July 19, 2023. (*Id.*) Appellee attended an online training for social media awareness in corporate standards for her job. (*Id.* at p. 17). Appellee was discussing stalking and cyberstalking with one of her co-workers. (*Id.*) Her co-worker said, "well, you do have a stalker, and punched [Appellee's] name into Twitter and there it was, years of [Appellant] posting about [Appellee] on Twitter, on Instagram, on Facebook. * * * Damaging stuff."[2] (*Id.*)

**{¶8}** Appellee told the court:

Your Honor, and that's only a little bit. Due to the multiple postings, it is mentally damaging to know that somebody out there is stalking your property, stalking you, posting about your [terminal] cancer, posting about

---

[1] The year was not specified in the record but Appellee revealed Appellant began posting about her in 2016. (*Id.* at p. 26).

[2] Appellee filed her Petition for a CSPO the next day.

a six-year-old grandson that she has never met, posting about two of my children who she has never met.

I have requested - - I contacted her on the 20th or the 19th, I believe, and asked her via text message to please stop this. And it turned into her accusing me of being a flying monkey and that I was stalking her.

(*Id.* at p. 18) (Petitioner's Exhibits 2, 3, 6).

{¶9}  When Appellee learned of these posts on various social media platforms, she contacted Appellant via text message.  (*Id.* at p. 19-20); *see* (Petitioner's Exhibit 2).  Appellee asked Appellant to remove all posts that contained any mention of her, stating, "The untrue statements that you're making are tarnishing my professional reputation.  They are slanderous and libel at best."  (*Id.* at p. 21).  Appellant responded on Facebook calling Appellee "emotionally immature."  (*Id.* at p. 21-22).

{¶10}  Appellee said Appellant is "constantly posting about [her] cancer."  (*Id.* at p. 23-24); (Petitioner's Exhibits 3, 6).  Appellee shared many posts with the court showing Appellant's "erratic behavior."  (*Id.* at p. 28).  The court asked Appellee, "Has [Appellant] threatened you in these posts?"  (*Id.* at p. 29).  Appellee replied, "[Appellant] threatens [in posts] by saying she casts spells and hexes and stuff like that.  It's spiritual and it's uninvited. * * * That [Appellant] is a witch."  (*Id.*)

{¶11}  Appellee also mentioned a post "directed on [Appellee's] name" in which Appellant said, "be careful, Do you really want to test me?"  (*Id.* at p. 30-31); (Petitioner's Exhibit 4).  That post was in "the whole circle" of people which included Appellee, Dan, and two people she never met (Mike and Risha).  (*Id.* at p. 31).  Appellant also posts (including videos, memes, and pictures) about Appellee's grown children and grandson stating "we are horrible people[.]"  (*Id.* at p. 31-32).

{¶12}  After the text message exchange, Appellee said, "I immediately was fearful for my safety, my life, the safety of my family, friends, pets and my property."  (*Id.* at p. 32-33).  Appellant "has repeatedly posted on social media platforms comments on [Appellee's] relationship with [Appellant's] ex-husband."  (*Id.* at p. 33).  Appellee further indicated:

* * * I have also mentioned that I am living with body dysmorphia and several eating disorders. And reading these comments about my appearance is a gut punch and mentally damaging. Since then I have slept very little, my mental state is not okay. And that is not the only reason I fear [Appellant], due to her mental issues. She has weapons, and I fear for my safety. She has made comments on Facebook that she will kill Dan if he [wants to be violent].

(*Id.*); (Petitioner's Exhibits 1, 7).

{¶13} Appellee revealed Appellant has a "history of stalking." (*Id.* at p. 34). Appellee mentioned Appellant also stalked two other individuals in West Virginia. (*Id.*) Appellant was seen in a post "sitting on the steps of their home with tarot cards." (*Id.*)

{¶14} Appellee also mentioned a 2019 incident in which Appellant sent police officers to their house in the middle of the night to check on her children "because [Appellant's] spirit guides told her [Appellee] was abusing her daughter." (*Id.* at p. 34-35). Appellee admitted she had a physical altercation with Appellant in 2018 but said she has gone to therapy and has "fixed [her] rage issues." (*Id.* at p. 35).

{¶15} Appellee concluded her testimony by stating:

I am asking for the Court to order this protection order because I'm in fear for my life, my safety, the safety of my friends, family, and the community. Trying to get prepared for this hearing today was a difficult task. Posts that [Appellant] has made on public social media platforms are concerning. She claims that she is bringing plagues to the masses. She credits herself with COVID, earthquakes, floods, while also preaching kindness. I had to stop looking at it, it's mentally damaging. [Appellant] also claims that I am stalking her, but that's simply not true. I found all of this because of a work training.

(*Id.* at p. 36) (Petitioner's Exhibits 2, 5).

{¶16} Appellant did not deny making any of the posts about Appellee on social media. (*Id.* at p. 38). Appellant claims she is a "psychic empath," i.e., "a mentally

documented phenomenon" in which she "feel[s] people's feelings." (*Id.* at p. 39). Appellant said a couple years ago, she thought she had breast cancer but it turned out that it was "a message" about Appellee. (*Id.* at p. 40).

**{¶17}** Appellant testified she has been posting information on social media about Appellee since around 2014.[3] (*Id.*) Appellant said she stopped posting about Appellee after being served with the CSPO. (*Id.* at p. 41). Appellant believes everything that has happened is "just proof that [she has] premonitions." (*Id.* at p. 45). Appellant has been receiving psychiatric treatment for about ten years. (*Id.* at p. 47). Appellant said she has "social anxiety, major depressive disorder, complex PTSD, [and] fear of intimacy." (*Id.* at p. 49).

**{¶18}** Appellant stated she is violent toward herself but not toward others. (*Id.*) Appellant claims she is not obsessed with or jealous of Appellee. (*Id.* at p. 49-50). Appellant said, "I don't stalk. The information just comes to me. And I can't stop it or help it." (*Id.* at p. 50). Appellant has "been trying very hard to get better." (*Id.* at p. 52-53).

**{¶19}** On August 8, 2023, the magistrate issued a CSPO with Appellee as the protected person effective until August 8, 2028. In the Order, the court checked the box stating:

> The Court finds by a preponderance of the evidence that 1) Respondent [Appellant] has knowingly engaged in a pattern of conduct that caused Petitioner [Appellee] to believe that Respondent [Appellant] will cause physical harm or cause or has caused mental distress; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from stalking offenses.

(8/8/2023 CSPO Order, p. 2).

**{¶20}** On August 22, 2023, Appellant filed objections to the magistrate's decision. On September 11, 2023, the trial court overruled Appellant's objections and adopted the magistrate's decision.

**{¶21}** Appellant filed a timely appeal and raises one assignment of error.[4]

---

[3] As stated, Appellee testified she did not meet Appellant until 2016. (*Id.* at p. 10).
[4] Appellee did not file a brief.

**ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN GRANTING APPELL[EE] A CIVIL STALKING PROTECTION ORDER AS THE APPELL[EE] FAILED TO MEET THE PREPONDERANCE OF EVIDENCE STANDARD NECESSARY TO ESTABLISH A VIOLATION OF THE MENACING BY STALKING STATUTE, ORC 2903.211.**

**{¶22}** In her sole assignment of error, Appellant takes issue with the granting of the CSPO and challenges the trial court's judgment as being against the manifest weight of the evidence. Appellant asserts Appellee failed to meet her burden in providing evidence that Appellant knowingly caused Appellee to believe Appellant would cause her physical harm or mental distress.

**{¶23}** We review the decision to grant a CSPO for an abuse of discretion. *T.V. v. R.S.*, 8th Dist. Cuyahoga No. 110049, 2021-Ohio-2444, ¶ 22. An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 35.

**{¶24}** Appellant contends the CSPO should not have been granted. Thus, we apply a manifest weight of the evidence standard of review. *Tabak v. Goodman*, 7th Dist. Mahoning No. 21 MA 0042, 2022-Ohio-1123, ¶ 6, citing *D.R.B. by K.G.B. v. G.T.B.*, 7th Dist. Noble No. 17 NO 0452, 2018-Ohio-2787, ¶ 8.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the (finder of fact) that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis sic.) (*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541), quoting Black's at 1594.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12. When evaluating whether a decision is contrary to the manifest weight of the evidence, every reasonable presumption must be made in favor of the judgment. *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3 (and if the evidence is susceptible to more than one construction, the court of appeals must interpret the evidence in a manner consistent with the judgment).

*Tabak, supra,* at ¶ 6.

**{¶25}** Here, the CSPO was filed in accordance with R.C. 2903.214. Pursuant to that statute, the issuance of a CSPO requires the petitioner to establish a violation of R.C. 2903.211, "Menacing by stalking," which states in part:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

Case No. 23 MA 0108

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

R.C. 2903.211(A)(1) and (2)(a)(b).

**{¶26}** The culpable mental state required for menacing by stalking is "knowingly." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶27}** A "pattern of conduct" is defined in part as: "[T]wo or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * *." R.C. 2903.211(D)(1).

> Finally, the petitioner must demonstrate that the respondent knowingly caused a protected person to believe that the respondent will cause them physical harm or mental distress. Notably, the statute is written in the disjunctive, therefore, the petitioner is only required to prove that the respondent *either* caused a protected person to believe that he or she will cause them physical harm, *or* cause a protected person to believe that he or she will cause them mental distress. * * *

*Holloway v. Parker*, 3d Dist. Marion No. 9-12-50, 2013-Ohio-1940, ¶ 23.

**{¶28}** "Physical harm" or "physical harm to persons" is defined as: "[A]ny injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

> For purposes of menacing by stalking, the petitioner need not show that the respondent made an explicit or direct threat of physical harm. *Kramer* [*v. Kramer*, 3d Dist. Seneca No. 13-02-03]*,* 2002-Ohio-4383, at ¶ 15. Instead, "the test is whether the (respondent), by engaging in a pattern of conduct, knowingly caused (the protected person) to believe (he) would cause

Case No. 23 MA 0108

physical harm to him or her." *Id.,* citing *State v. Jones,* 12th Dist. No. CA95-12-122 (Oct. 21, 1996).

*Holloway, supra*, at ¶ 24.

**{¶29}** "Mental distress" is defined as:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

"Mental distress need not be incapacitating or debilitating." *Joy v. Letostak*, 10th Dist. Franklin No. 14AP-1040, 2015-Ohio-2667, ¶ 25. "Explicit threats are not necessary to establish menacing by stalking under R.C. 2903.211." *Bartells v. Bertel*, 12th Dist. Butler No. CA2016-11-216, 2018-Ohio-21, ¶ 56, citing *Lundin v. Niepsuj*, 9th Dist. Summit No. 26015, 2014-Ohio-1212, ¶ 19. It is instead the "duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions." *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, 856 N.E.2d 1003 ¶ 7 (12th Dist.). In making this determination, the trial court "may rely on its knowledge and experience in determining whether mental distress has been caused." *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 18 (4th Dist.). * * *

*Tabak, supra,* at ¶ 9.

**{¶30}** Based on the facts presented, the trial court did not abuse its discretion in granting Appellee's Petition for a CSPO against Appellant as Appellee established that Appellant violated R.C. 2903.211(A)(1) and (2). The record reveals a pattern of conduct by Appellant. *See* R.C. 2903.211(D)(1); *Holloway, supra,* at ¶ 23. The record further

Case No. 23 MA 0108

reveals a sufficient finding that Appellant's threats knowingly led Appellee to believe Appellant would cause physical harm to her or her family resulting in Appellee suffering mental distress. *See* R.C. 2901.22(B); R.C. 2901.01(A)(3); *Holloway* at ¶ 24; R.C. 2903.211(D)(2); *Tabak, supra,* at ¶ 9.

**{¶31}** As stated, Appellee testified Appellant threatened her household via a Twitter post in which she stated: "I already have 9mm glocks and a .308 rifle. I practice with them and if Dan decides he wants to be violent, or wants to pay someone to be, I'll be ready." (8/8/2023 CSPO Hearing Tr., p. 11-12); (Petitioner's Exhibit 1).

**{¶32}** Appellant posted personal information about Appellee on social media platforms. (*Id.* at p. 16). Appellee did not become personally aware of the postings until July 19, 2023 while she was attending a work training for social media awareness. (*Id.* at p. 16-17). Appellee was discussing stalking and cyberstalking with one of her co-workers. (*Id.* at p. 17). Her co-worker said, "well, you do have a stalker, and punched [Appellee's] name into Twitter and there it was, years of [Appellant] posting about [Appellee] on Twitter, on Instagram, on Facebook. * * * Damaging stuff." (*Id.*)

**{¶33}** Appellee told the court: "Due to the multiple postings, it is mentally damaging to know that somebody out there is stalking your property, stalking you, posting about your [terminal] cancer, posting about a six-year-old grandson that she has never met, posting about two of my children who she has never met." (*Id.* at p. 18) (Petitioner's Exhibits 2, 3, 6).

**{¶34}** Appellee said Appellant is "constantly posting about [her] cancer." (*Id.* at p. 23-24); (Petitioner's Exhibits 3, 6). Appellee shared many posts with the court showing Appellant's "erratic behavior." (*Id.* at p. 28). The court asked Appellee, "Has [Appellant] threatened you in these posts?" (*Id.* at p. 29). Appellee replied, "[Appellant] threatens [in posts] by saying she casts spells and hexes and stuff like that. It's spiritual and it's uninvited. * * * That [Appellant] is a witch." (*Id.*)

**{¶35}** Appellee also mentioned a post "directed on [Appellee's] name" in which Appellant said, "be careful, Do you really want to test me?" (*Id.* at p. 30-31); (Petitioner's Exhibit 4). That post was in "the whole circle" of people which included Appellee, Dan, and two other people she never met. (*Id.* at p. 31). Appellant also posts (including videos,

memes, and pictures) about Appellee's grown children and grandson stating "we are horrible people[.]" (*Id.* at p. 31-32).

**{¶36}** Appellee further indicated:

> * * * I have also mentioned that I am living with body dysmorphia and several eating disorders. And reading these comments about my appearance is a gut punch and mentally damaging. Since then I have slept very little, my mental state is not okay. And that is not the only reason I fear [Appellant], due to her mental issues. She has weapons, and I fear for my safety. She has made comments on Facebook that she will kill Dan if he [wants to be violent].

(*Id.*); (Petitioner's Exhibits 1, 7).

**{¶37}** Appellee concluded her testimony by stating: "I am asking for the Court to order this protection order because I'm in fear for my life, my safety, the safety of my friends, family, and the community. * * * Posts that [Appellant] has made on public social media platforms are concerning. * * * I had to stop looking at it, it's mentally damaging." (*Id.* at p. 36) (Petitioner's Exhibits 2, 5).

**{¶38}** Appellant did not deny making any of the posts about Appellee on social media. (*Id.* at p. 38). Appellant claims she is a "psychic empath" and has "premonitions." (*Id.* at p. 39, 45). Appellant said she is not violent toward others. (*Id.* at p. 49). Appellant claims she is not obsessed with or jealous of Appellee. (*Id.* at p. 49-50). Appellant said, "I don't stalk." (*Id.* at p. 50).

**{¶39}** When testimony presents a "she-said," "she-said" situation, the trial court is in the best position to judge credibility and determine whether to believe the appellant or the appellee. *See Tabak, supra,* at ¶ 20. Given the deference we must afford the trial court's judgment, as well as its credibility determinations when presented with any conflicting testimony, the trial court committed no error, based on the evidence presented, including Appellee's seven exhibits, in granting Appellee's Petition for a CSPO against Appellant. *Id.* at ¶ 21.

## CONCLUSION

**{¶40}** For the foregoing reasons, Appellant's sole assignment of error is not well-taken. The September 11, 2023 judgment of the Mahoning County Court of Common Pleas overruling Appellant's objections and adopting the magistrate's decision granting Appellee's Petition for a CSPO is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**