[Cite as *L.F. v. Simpson*, 2026-Ohio-1019.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

L.F.,

Plaintiff-Appellee,

v.

NATHANIEL C. SIMPSON, SR.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0089**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2024 CV 2400

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

L.F., Plaintiff-Appellee and

Nathaniel C. Simpson, Sr., Defendant-Appellant.


Dated: March 24, 2026

**DICKEY, J.**

{¶1} Appellant, Nathaniel C. Simpson, Sr., who has acted pro se throughout these proceedings, appeals the July 11, 2025 entry of a Civil Stalking Protection Order ("CSPO"), pursuant to R.C. 2903.214, by the Mahoning County Court of Common Pleas in favor of Appellee, L.F., who has also acted pro se throughout these proceedings. Appellant advances two assignments of error. First, he contends the trial court committed plain error when it adopted the decision of the magistrate, without first and sua sponte granting an opportunity to Appellant to file a supplemental brief after he received copies of the hearing exhibits, which were not attached to the hearing transcript. Second, Appellant argues the entry of the CSPO is against the manifest weight of the evidence as there is no evidence in the record that he threatened Appellee. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On October 22, 2024, Appellee, an aspiring vocalist and Mahoning County resident, filed a petition for CSPO pursuant to R.C. 2903.214 against Appellant, a local artist manager and Trumbull County resident. She requested protection for her and her husband.

{¶3} The petition reads in relevant part:

[Appellant] told me that he owns multiple military grade guns, which he apparently inherited from his brother (deceased) (approximately May 6, 2024).

He has called, texted, and e-mailed my husband and I non-stop (against our wishes) every month since we have told him to cease contact with us and to return [Appellee's] things (which he did not) (started on June 9th and is currently ongoing).

{¶4} Attached to the petition is a handwritten list containing twenty-three additional allegations, including: Appellant contacted Appellee's eye doctor without Appellee's consent to order contact lenses for her; Appellant disclosed Appellee's medical

diagnosis to members of his production team with the purpose of humiliating her; Appellant wrongly accused Appellee of owing him money; Appellant used Appellee's medical diagnosis and her father's death to control her. All of the alleged conduct occurred in 2024.

**{¶5}** The magistrate issued an ex parte CSPO on October 23, 2024. A full hearing was scheduled for November 6, 2024. At the hearing on November 6, 2024, the magistrate accepted the testimony of Appellee and Appellant.

**{¶6}** Appellee testified she was employed as a bus driver when a local pastor encouraged her to contact Appellant via electronic mail on November 6, 2023. The pastor informed Appellee that Appellant was looking for a vocalist "of her range." (11/6/24 Hrg. Tr., p. 6.)

**{¶7}** The parties met in person for the first time at Appellant's house/office on November 28, 2023. (*Id.* at p. 7.) According to Appellee, Appellant's house/office was the same location as a shop formerly run by Appellee's aunt, L.D. Appellee testified it was on this date that Appellant discovered Appellee was L.D.'s niece. Appellant and L.D. had a previous romantic relationship, which Appellee alleged had culminated in the issuance of a CSPO against Appellant and in favor of L.D. Appellant alleged the CSPO had been vacated by the Eleventh District Court of Appeals.

**{¶8}** The parties have confused a CSPO with a misdemeanor charge of menacing by stalking. A decision of the Eleventh District Court of Appeals, reversing Appellant's menacing by stalking conviction and remanding the matter for retrial to the Trumbull County Court of Common Pleas, was an exhibit offered at the November 6, 2024 hearing. Appellant's conviction following a bench trial was reversed because Appellant had demanded a jury trial. *State v. Simpson*, 2024-Ohio-2865 (11th Dist.).

**{¶9}** Appellee testified Appellant "decided to take [her] under his wing . . . because apparently [she] was way too talented to be just doing a small gig like that that [sic] only paid, like, 150 bucks." (Hrg. Tr., p. 7.) However, in retrospect, Appellee contends Appellant's discovery of her familial relationship with L.D. precipitated seven months of mental and emotional abuse by Appellant, which included explosive reactions when Appellee disagreed with his advice and counsel regarding her career.

{¶10} Appellee's relationship with Appellant began as an equal partnership, but Appellant progressively attempted to assert greater control over her. Among Appellant's efforts to manipulate and control Appellee, he disclosed her medical diagnosis to other members of his creative team. He claimed she often had tantrums.

{¶11} The magistrate specifically inquired, "[a]t any point, did [Appellant] make any verbal threats to you?" (*Id.* at p. 9.) Appellee responded Appellant made her feel "unsafe" at one point when he disclosed he was in possession of military grade guns, which he inherited from his brother. (*Id.* at p. 8.) The magistrate asked, "[d]id you take that as a threat?" Appellant responded, "whenever he would get angry any time after that I would get worried, especially since I heard from [L.D.] that he had pulled a gun out on my cousin . . . in the parking lot. And just some of the things that she's told me about him." (*Id.* at p. 11.)

{¶12} When the magistrate asked Appellee to describe any time she felt "fearful" of Appellant, Appellee testified Appellant violated her privacy by sharing her contact information with strangers without informing her. Appellee further testified Appellant "use[d] her dad's death as a tactic to keep [her] down." (*Id.* at p. 12.)

{¶13} Next, the magistrate inquired if there were instances when Appellant was "yelling or acting aggressively to [Appellee]?" Appellee responded, "[o]h, yes. All the time. All the time." (*Id.* at p. 13-14.) When the magistrate asked for examples, Appellee replied, "he would try to control me by saying things." (*Id.* at p. 14.) Appellant told Appellee her attitude was "very out of control," which he attributed to her "naiveness." He characterized her as "highly immature." (*Id.*) He regularly dismissed her opinion with respect to business matters when it conflicted with his own.

{¶14} Appellee "tried to cut [Appellant] off after July." (*Id.* at p. 15.) The month of July constituted a one-month window Appellee established to facilitate the return of their respective property. According to Appellee's testimony, Appellant blatantly refused to return Appellee's money, music, and ownership papers, and refused to provide a "dissolution paper." (*Id.*)

{¶15} Appellee testified Appellant contacted her three times after she demanded he cease contact. The record contains three electronic mails sent within a few days in August, and one electronic mail sent in September. When the magistrate asked if the

messages were "concerning," Appellee responded, "[t]hey were kind of dumb messages. One of them was him reiterating that [Appellee], quote/unquote, owe[s] him a thousand dollars. When [she] clearly [does not]." (*Id.* at p. 16.)

**{¶16}** Appellee conceded the content of the other electronic mails could be summarized generally as "hey, look at my artist that hit the billboard tracks. This could have been you." (*Id.* at p. 16-17.) Nonetheless, Appellee was "startled" when a photograph of Appellee and L.D., which was not available on Appellee's public Facebook page, was attached to one of Appellee's electronic mails. (*Id.* at p. 17.)

**{¶17}** Midway through Appellee's testimony, the magistrate reprimanded Appellant for interjecting comments. (*Id.* at p. 35.) The magistrate informed Appellant that he would have the opportunity to testify later in the proceedings.

**{¶18}** Next, Appellee testified Appellant made "sexual comments" during their final conversation. At the time, Appellee was wearing a jumpsuit that exposed a portion of her breasts. Appellant asked if her stretch marks were the result of a previous pregnancy. Appellee denied any prior pregnancy. Appellee testified, "[a]nd he was like, well, have you ever like, I don't know, other stuff? And [she was] like no. And that just made [her] feel uncomfortable because he was looking at [her] chest." (*Id.* at p. 37.) Appellant also asked Appellee for a photograph of her when she was younger to display in his home, which Appellee thought was "weird." (*Id.* at p. 38.)

**{¶19}** Appellee, who was a newlywed, testified she would frequently discuss her marital issues with Appellant. Appellant counseled her that sex was always the answer. Appellant twice commented that "he wishe[d] there was a younger [Appellant] so that he could show [Appellee] the difference between making love, fucking and what – and just having sex to have sex." (*Id.* at p. 38.) When Appellee told Appellant that the foregoing comment made her uncomfortable, Appellant responded that "he no longer wishe[d] to be [her] marriage counsel . . . and want[ed] to stay out of it from [this] point on." (*Id.*)

**{¶20}** During Appellee's testimony, she frequently cited contractual disputes between the parties regarding money, which the magistrate explained were not within the jurisdiction of the trial court on a CSPO. (*Id.* at p. 19.) The magistrate declined to admit the majority of Appellee's exhibits, with the exception of the "Josh and Nate Group texts," the "Nate and Josh Charles texts," the text between the parties, and the group texts, with

the caveat that the magistrate would not consider anything she deemed irrelevant to the CSPO.

**{¶21}** Finally, the magistrate inquired whether Appellee had suffered any mental distress as a result of Appellant's conduct. Appellee testified Appellant would call her at all hours because he was privy to her touring schedule, which resulted in her loss of sleep. (*Id.* at p. 44.) She further testified "there were a lot of moments where [she] cried" because Appellant's disclosure of her medical diagnosis "made [her] start doubting [herself] in a lot of situations." (*Id.* at p. 46.)

**{¶22}** Appellant provided the following testimony at the hearing. In response to the magistrate's question regarding Appellant's relationship with Appellee, Appellant testified, in his opinion, the relationship "is still okay." (*Id.* at p. 47.) With the magistrate's approval, Appellant wished Appellee a "happy birthday."

**{¶23}** Appellant denied any effort to control Appellee, but testified he "was" her manager, then clarified "[o]r should I say I am; am as in current standing. And I am a co-executive on her publishing. And I am a statutory agent with the company I helped her form." (*Id.* at p. 47-48.)

**{¶24}** When the magistrate asked Appellant if he had made any sexual remarks to Appellee, he responded:

> I wouldn't call it sexual. Let me explain and break it down, if I may.
>
> [Appellee], first of all, is an extremely, extremely gifted and talented vocalist. Second to none that I have met. And I've worked with many from Natalie Cole to Patti Labelle to current artists of this very day.
>
> Her gift is a gift. It's not just a talent. And I want nothing but the best for her career.
>
> This matter has nothing to do with her talent. It has everything to do with her perception and reality of the how she co-mingles and deals with people of authority. That includes her previous bosses that she complained about that she's no longer employed by.

That includes people, including her own husband, which he and I have confided in each other. She never told me that she had [medical diagnosis]. It was her [medical diagnosis] that brought that revelation to my attention. It was her husband that demanded that she inform me of this prior to us certifying this – the five or six agreements we had.

(*Id.* at p. 48-49.) The foregoing response to the magistrate's question regarding Appellee's allegations of inappropriate sexual remarks is indicative of his overall testimony, which was largely non-responsive to the question posed.

**{¶25}** Appellant conceded he disclosed Appellee's medical diagnosis to "all [of the] people [he] brought into the fold that are in [his] camp." (*Id.* at p. 49.) He asserted it would be "extremely irresponsible of [him] to not let them know." (*Id.* at p. 60.)

**{¶26}** Next, the magistrate asked Appellant about Appellee's decision to terminate their relationship. Appellant offered a series of electronic mails, which he testified were evidence that *he* paused the relationship after Appellee failed to fulfill certain financial obligations associated with his management.

**{¶27}** Despite the July 30, 2024 deadline imposed by Appellee, Appellant continued to send electronic mails to her. In an August 1, 2024 electronic mail, Appellant acknowledges the deadline for Appellee's financial obligations was extended, and he requests legal documentation regarding their contractual agreement.

**{¶28}** An August 5, 2024 electronic mail contains the photograph of Appellee and L.D., which Appellee testified had startled her, and communicates Appellant's misdemeanor menacing conviction has been overturned. In response, Appellee accuses Appellant of stalking and defamation. She demands Appellant stop telling people that he represents her. She further demands Appellant return her music, money, and her key (which he was supposed to do during the month of June). Appellee forbids Appellant from contacting her family and friends or using a specific electronic mail address in the future. Finally, Appellee instructs Appellant to send legal matters only to a specific business electronic mail address.

**{¶29}** Nevertheless, Appellant continues to communicate with Appellee. He responds:

Case No. 25 MA 0089

I listened and [emoji] watched you blame SEVERAL people in your manipulative ways to make people confirm [sic] to you.

As for the your [sic] stalking B.S. shame on you. You post thing [sic] on PUBLIC Domains, and call it stalking? SMH. As the courts themselves have OFFICIALLY REVERSED that ill-minded madness [emojis] your Aunt did too.

It was YOU & YOUR BEHAVIOR that created the legal process ahead of us. You NEVER intended to pay your debt. You simply wanted intel –Idea's [emoji] and vision (Beyond YOURS) to benefit your very small entertainment career you brought to the table.

As my Mother would say: It will all come out in the wash.

So we'll allow the courts to handle the disagreement. And wish each other well.

Done with class and NOT LIES.

{¶30} Three days later, on August 8, 2024, Appellant forwarded attached documents for Appellee's review to an electronic mail reading in relevant part, "[s]o, regarding your statement of Defamation and lying spirits lacking INTEGRITY. The ONLY question is: 'When is ENOUGH, ENOUGH And it STOP? **NOT OUR WILL BUT ALL, PRAISE BE TO OUR GOD YAHWE[H] JEHOVAH**!" (Emphasis in original.)

{¶31} On September 18, 2024, Appellant sent an electronic mail to Appellee with an attachment. The electronic mail reads, "[t]his is one of my other Artist's [sic] now on the charts at #6 Strong [emoji] and climbing [emoji]. She came to us with a third 1/3 of the talent [emoji] and (Artist Development), time put into you!!"

{¶32} Next, Appellant offered a photograph of himself and Appellee, in which she is wearing a low-cut jumpsuit that reveals a portion of her breasts and what appears to be her undergarment. Appellant testified, "[i]f you notice the outfit that [Appellee] has on, it shows an extreme revealing of her bustline. I was concerned that we were going into a professional environment. And I didn't think that much revealing was appropriate." (Tr.,

p. 52.)  Appellant conceded the music industry typically encourages female artists to wear revealing outfits, but "as a dad, as a grandfather, as a mentor" he did not want Appellee to present herself in that way.  (*Id.* at p. 54.)

**{¶33}**  Appellant continued, "[t]hat's when I noticed that she had stretch marks on her. And I informed her by her age most women that I know, raised by my mother, my aunt and sister, older sisters, they get stretch marks when they have children." (*Id.* at p. 52-53.)  Appellant explained he had three or four conversations with Appellee and her husband that pregnancy violates the terms of her contractual agreements, which are predicated on a "timeline of fulfilling certain obligations." (*Id.* at p. 53.)

**{¶34}**  The magistrate asked Appellant whether he had made "sexual remarks to [Appellee] about [how he wished he] was a younger Nate."  (*Id.* at p. 54.)  Appellant replied:

> I did. But this is what it was pertaining to.  So let me unpack it.
>
> When you're recording certain songs, certain songs are love songs. And she was asking me about her own – by her own admission in this conversation, she would ask me about the creation of compositions that I wrote as an earlier young man.
>
> And I would tell her I was in love with this woman at the time and this woman aspired [sic] me to write this. And this is what was going on in my life.
>
> And she would Q and A me about it.  So I would say well, I can't necessarily tell you how to do it because I am not a young man anymore. And you're not single anymore. And I'm not single anymore. So I can't get into the depths of all of that.
>
> But this is what's going on in my life. So I'm narrating her the best I can what it took for me to write this song, or what these lyrics were pertaining to and how this melody [sic]. Because she was struggling on being able to perform it.

(*Id.* at p. 54-55.)

{¶35} Finally, the magistrate inquired if Appellant continued to contact Appellee after she instructed him to cease contact.  He conceded he continued to contact her.

{¶36} Appellant alleged Appellee was "trying to use this particular forum to try to manipulate or maneuver herself to get out of what [the parties] have in written documents." (*Id.* at p. 57.)  Appellant testified his intention was to "postpone[ ] and cease and desist on moving forward until . . . she fulfills her obligations." (*Id.*)  Appellant added, "[t]his was all coming out of my pocket, all the rehearsals, all the time, all the expenditures, all the people.  The only thing she paid for was the fulfillment of what she needed to do to get her own company, of which I did that [pro bono]." (*Id.* at p. 58.)

{¶37} Appellant denied that his home/office was L.D.'s shop or that he ever threatened Appellee.  He testified:

> I think I'm broken hearted. I spent a lot of money and time to help
> her; a lot of it. And all she had to do is pay that little bit of money to – even
> if she didn't have it. All she could have just said, I don't have it all. Can I
> give it to you in increments? Because I asked her to do that as well in the
> emails.

(*Id.* at p. 63.)

{¶38} Without any inquiry from the magistrate, Appellant added:

> These kind of arenas where people make false accusations and
> allegations can scar people. I've seen it.  And it's wrong.

> They don't know the logistics on what happens down the road when
> they put people in these situations and they're wrong.

> But thank God for certain judges that see through things and have
> great discernment.

> So I'm asking you to know – yes, I do have brothers that have served
> in the military and sisters. I'm the youngest of all of them.  And they do have,

of course items they brought back. But they go to my family. And yes, my brother gave them to me. But they go to my family because they're in honor of my family's – my mother and father and their children served this country. But not at any given time – those two I wish God totally blesses them.

. . .

And I'm going to leave, I'm going to leave you and hopefully your wisdom.

(*Id.* at p. 65-66.)

**{¶39}** At the conclusion of Appellant's testimony, the magistrate admitted the foregoing electronic mails and photograph into evidence.

**{¶40}** Next, the magistrate observed:

This is not the typical type of protection order. Normally we do have threats, that sort of thing. But I understand the sentiment.

In fact, [Appellant], if I'm being honest, I feel like you tried to control the entire proceeding today, as well as me.

So I understand some of the complaints because of the way that you treated this process and tried to direct what I'm going to do. And honestly, made threats towards the end.

(*Id.* at p. 70.)

**{¶41}** The trial court issued the CSPO on November 12, 2024. The CSPO terminates on October 21, 2027, roughly three years after the ex parte CSPO was granted. The CSPO reads in relevant part:

[Appellant] engaged in a pattern of conduct over the course of several months where it was clear from his communications with [Appellee] that he was trying to assert authority over her, control her, and manipulate

her. He did not make any direct physical threats of harm. However, he communicated with her in a manner that was worrisome, and became upset when she did not see things his way. He also shared information about [Appellee] with others even though he knew that made her uncomfortable, such as a medical diagnosis. When she discovered that he had lied to her about his contacts and connections in the music business and tried to cease communication with him, he continued to message her on at least two occasions after she asked him not to communicate with her or her husband any longer. He also made at least two sexual remarks to her that caused her discomfort considering he was much older than her and supposed to be a mentor. He further mentioned that he had multiple military grade weapons that he inherited. While he did not make any direct threats with the weapons, [Appellee] perceived this as a veiled threat, as did the court. As a result of [Appellant's] actions, [Appellee] suffered mental distress. Specifically, she had trouble sleeping and often cried to her husband as a result of [Appellant's] manipulation. Overall, the Court found [Appellee] to be much more credible than [Appellant.]

(11/12/24 CSPO, p 2).

{¶42} On November 18, 2024, Appellant filed a motion for an extension of time of 60 days to file his objections to the CSPO. The motion reads in relevant part, "[Appellant] has been notified via the County Court Recorder Division that the transcriber is on long-gated [SIC] sick leave. *And WILL NOT have the transcript available to (ATTACH) until her return to the courts [sic] employment*." (Emphasis in original) (11/18/24 Mot., p. 1.) However, a notice from the official court reporter is attached to the motion. The notice reads that a transcript will be provided within 30 days after Appellant tenders $250.

{¶43} On November 21, 2024, the magistrate overruled the motion. The order of magistrate reads in relevant part:

Pursuant to Civ. R. 53(D)(3)(b)(iii), an objection to a factual finding shall be supported "by a transcript of all the evidence submitted to the

Case No. 25 MA 0089

magistrate relevant to that finding **or an affidavit of that evidence if a transcript is not available."** (emphasis added).  Because a transcript is not available at this time, and it is uncertain when one will be available, [Appellant] can file an affidavit in lieu of a transcript."

(Emphasis in original) (11/21/24 Order, p. 1.)

**{¶44}**  Civ.R. 65.1, captioned "Civil Protection Orders," specifically states that "[a] magistrate's denial or granting of a protection order after full hearing under this division does not constitute a judgment or interim order under Civ.R. 53(D)(4)(e) and is not subject to the requirements of that rule." Ohio Civ.R. 65.1(F)(3)(c)(iv). Therefore, Civ.R. 53, captioned, "Magistrates," is inapplicable to civil protection orders.  Civ.R. 65.1(G) does not provide for an objection to the magistrate's decision as in Civ.R. 53, but rather, it provides for an objection to the trial court's decision adopting the magistrate's decision. *J.S. v. D.E.*, 2017-Ohio-7507, ¶ 15.

**{¶45}**  On November 25, 2024, Appellant filed a motion for discovery, requesting " 'COMPLETE and FULL DISCOVERY and INTEL' towards **2024 CV 2400**." (emphasis in original).  In the motion, Appellant accuses Appellee of "ill-refutable perjur[y]" [sic] designed to escape responsibility for her contractual obligations relating to their business arrangement. On November 27, 2024, Appellant filed his affidavit and motion in objection to the magistrate's order ("motion in objection").

**{¶46}**  However, on December 2, 2024, the magistrate recognized the "discovery" sought by Appellant, the exhibits admitted at the November 6, 2024 hearing, was in the possession of the absent court reporter, so the magistrate stayed the action pending Appellant's receipt of the full transcript with exhibits.  The stay was lifted on February 5, 2025, when the transcript was filed, and Appellant was sua sponte granted a fourteen-day extension to file supplemental objections.  Relevant to this appeal, no supplemental pleading was filed.  As a consequence, the trial court considered Appellant's motion in objection.  On July 11, 2025 the CSPO was adopted by the trial court in a judgment entry pursuant to Civ. R.65.1(F)(3)(c).

**{¶47}**  However, on July 16, 2024, the magistrate issued an order, which reads in its entirety:

On February 5, 2024 the Court issued an Order indicating "that the transcript and exhibits have been prepared and provided to [Appellant] . . .", however it has come to the Court's attention that the exhibits were filed under separate cover and not provided to [Appellant].

The Clerk of Court is ordered to provide copies of the exhibits filed under separate cover on February 4, 2025.

It is so ordered.

(7/16/25 Order, p. 1.)

**{¶48}** Appellant filed a pleading captioned "APPEALS With AFFIDAVIT MOTION TO STAY RULING of ORDER" on July 21, 2025. The motion indicates he had not received the "discovery" as of July 19, 2025. On July 25, 2025, Appellant filed a pleading captioned "APPEAL TO DISMISS With AFFIDAVIT." The pleading alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), based on "suppression" of the exhibits admitted into the record at the hearing.

**{¶49}** On August 14, 2025, a "receipt" was executed by Appellant indicating he retrieved copies of the exhibits from the clerk of court's office. The receipt was filed with the Court the same day. In the roughly two weeks following Appellant's receipt of the exhibits, he did not seek additional time to file a supplemental brief based on the lack of availability of the exhibits when he filed his original objections.

**{¶50}** On August 27, 2025, the trial court dismissed both of Appellant's pending motions because the objections had already been overruled and the trial court no longer had jurisdiction.

**{¶51}** Appellant filed his "Notice of Appeals" on September 18, 2025. Although not raised by Appellee, the notice of appeal was not filed within the thirty-day deadline after the July 11, 2025 entry. Ohio Appellate Rule 4(A)(1) requires a party who wishes to appeal from an order that is final upon its entry to file an appeal within thirty days. Practically, Appellant was not on notice that the July 11, 2025 Judgment Entry was a final order until August 27, 2025. Given the procedural irregularity and Appellant's pro se status, we consider his appeal.

Case No. 25 MA 0089

## ANALYSIS

## ASSIGNMENT OF ERROR NO. 1

**THE HEARING COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT PROCEEDED WITH A RULING FROM THE MAGISTRATES [sic] DECISION KNOWING DISCOVERY & TRANSCRIPT DEMAND WAS UNSUCCESSFULLY SUBMITTED TO [APPELLANT] AND REPEATEDLY MADE AWARE TO THE COURT.**

**{¶52}** Our standard of review is dependent on the particular argument advanced in this appeal. In the heading of his first assignment of error, Appellant argues the trial court committed a due process violation when it did not sua sponte permit him to file a supplemental brief following his receipt of copies of the exhibits. In Appellant's "issue presented for review and argument" and the body of his argument in the first assignment of error, he asserts "the trial court erred in proceeding without a bench trial when it failed to submit a waiver signed by [Appellant] to a jury trial in the record in accordance with R.C. 2945.05, after constitutional rights demand for a jury trial to be offered or made available." We consider each argument in turn.

**{¶53}** We generally review a trial court's decision to grant a CSPO for an abuse of discretion. *J.S. v. Conkle*, 2024-Ohio-2330, ¶ 23 (7th Dist.). In *Orr v. Brantley*, 2024-Ohio-3245, ¶ 15 (11th Dist.), the Eleventh District applied the abuse of discretion standard to the trial court's decision to overrule a motion for continuance, as " '[t]he grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge.' " *Id.* at ¶ 15, quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981).

**{¶54}** "An abuse of discretion occurs when a court exercises its judgment 'in an unwarranted way, in regard to a matter over which it has discretionary authority.' " *Conkle* at ¶ 23*,* quoting *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. When applying the abuse of discretion standard, we may not substitute our judgment for that of the trial court. *Berk v. Mathews*, 53 Ohio St.3d 161, 169 (1990).

**{¶55}** The proceedings for granting a CSPO are governed by Civ.R. 65.1. A trial court may refer CSPO proceedings to a magistrate. Civ.R. 65.1(F)(1). When a petitioner

requests an ex parte CSPO, the magistrate shall conduct the ex parte hearing and, upon conclusion of the hearing, deny or grant an ex parte CSPO. Civ.R. 65.1(F)(2)(a). The magistrate shall then conduct a full hearing and, upon conclusion of the hearing, deny or grant a protection order. Civ.R. 65.1(F)(3)(a).

{¶56} A party may file written objections to the trial court's adoption, modification, or rejection, or any terms of the protection order, within fourteen days of the court's filing of the order. Civ.R. 65.1(F)(3)(d)(i). The party filing objections has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused his or her discretion. Civ.R. 65.1(F)(3)(d)(iii).

{¶57} The record demonstrates Appellant did not have the transcript or copies of the exhibits when he filed his motion in objection. He followed the magistrate's order in effect at the time, which required him to submit an affidavit in support of his objections.

{¶58} When Appellant was provided with a transcript, and a sua sponte extension of time to supplement his objections, he did not file a supplemental pleading. He chose instead to rely on his original objections.

{¶59} When Appellant was subsequently provided a copy of the exhibits, he did not request additional time to file a supplemental pleading. Simply stated, the trial court was not on notice that Appellant required additional time to supplement his objections. In the alternative, Appellant does not argue his motion in objection was deficient due to his lack of access to the exhibits. In other words, he does not contend he suffered any prejudice as a result of the court reporter's failure to attach the exhibits to the hearing transcript. Accordingly, we find the trial court did not abuse its discretion when it did not sua sponte extend the deadline for objections, and in the alternative, Appellant suffered no prejudice as a result of the trial court's inaction.

{¶60} In Appellant's "issue presented for review and argument" and the body of his argument in the first assignment of error, he asserts "the trial court erred in proceeding without a bench trial when it failed to submit a waiver signed by [Appellant] to a jury trial in the record in accordance with R.C. 2945.05, after constitutional rights demand for a jury trial to be offered or made available." (Appellant's Brf., p. 5.) The foregoing argument

is predicated upon Appellant's confusion regarding a CSPO and a criminal charge of menacing by stalking, and we find it is inapplicable to the current appeal.

**{¶61}** In summary, we find the trial court did not abuse its discretion when it did not sua sponte grant Appellant additional time to supplement his motion in objection after he received copies of the exhibits, and in the alternative, he suffered no prejudice as a consequence of the trial court's inaction. We further find Appellant's first assignment of error, to the extent it is predicated upon the lack of a written waiver of a jury trial, is likewise without merit.

## ASSIGNMENT OF ERROR NO. 2

### THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT ENTERED A VERDICT ON THE CHARGE OF THREATENING.

**{¶62}** In his second assignment of error, Appellant contends the CSPO should not have been granted, because there is no evidence Appellant threatened Appellee in the record. We apply a manifest weight of the evidence standard of review concerning the issuance of the CSPO. *Tabak v. Goodman*, 2022-Ohio-1123, ¶ 6 (7th Dist.), citing *D.R.B. by K.G.B. v. G.T.B.*, 2018-Ohio-2787, ¶ 8 (7th Dist.).

**{¶63}** In *Tabak*, *supra*, we summarized the appellate standard of review with respect to the manifest weight standard as follows:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [finder of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find *the greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic.) [*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541], quoting Black's [Law Dictionary] at 1594.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12. When evaluating whether a decision is contrary to the manifest weight of the evidence, every reasonable presumption must be made in favor of the judgment. *Id.* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3 (and if the evidence is susceptible to more than one construction, the court of appeals must interpret the evidence in a manner consistent with the judgment).

(Emphasis in original) *Tabak* at ¶ 6.

{¶64} The CSPO at issue in this appeal was filed in accordance with R.C. 2903.214. Pursuant to that statute, the issuance of a CSPO requires the petitioner to establish a violation of R.C. 2903.211, "Menacing by stalking," which reads in relevant part:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use

any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

R.C. 2903.211.

**{¶65}** Last year, the Ohio Supreme Court resolved a split among the districts as to whether the phrase "shall knowingly cause another person to believe that the offender will," which modifies "cause physical harm," also modifies "cause mental distress." *See*, *Z.J. v. R.M.*, 2025-Ohio-5662. At the time, the Fifth District's interpretation of the menacing-by-stalking statute placed its decision in conflict with decisions from the Fourth, Seventh, and Ninth Districts – all of which had concluded the statute requires a victim to actually experience mental distress. *See Smith v. Wunsch*, 2005-Ohio-3498, ¶ 11 (4th Dist.); *Caban v. Ransome*, 2009-Ohio-1034, ¶ 23 (7th Dist.); *State v. Payne*, 2008-Ohio-5447, ¶ 7 (9th Dist.).

**{¶66}** The Ohio Supreme Court agreed with the statutory interpretation of the Fifth District, writing:

The Fifth District certified the following question for review: " 'Whether R.C. 2903.211(A)(1) requires a victim to actually experience mental distress or only believe that the stalker will cause the victim physical harm or mental distress, for a court to issue a civil stalking protection order.' " 2024-Ohio-1507, 232 N.E.3d 808, quoting No. 2022 CA 0071, at 7 (5th Dist. Mar. 4, 2024). The answer to that question lies within the statute's structure. Both R.C. 2903.211(A)(1)'s grammar and context show that a victim's belief that an offender will cause him mental distress is enough to show a violation of the menacing-by-stalking statute. And because R.C. 2903.214(C)(1) requires only a showing that a respondent in a civil-stalking-protection-order proceeding has violated R.C. 2903.211, it follows that a

petitioner need not show that he has suffered actual mental distress – but only *a belief that the respondent will cause him mental distress* – to obtain a civil stalking protection order.

(Emphasis added) *Z.J. v. R.M.* at ¶ 46 (overruling *Caban*).

**{¶67}** The culpable mental state required for menacing by stalking is "knowingly." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶68}** A "pattern of conduct" is defined in part as: "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents . . ." R.C. 2903.211(D)(1).

**{¶69}** "Physical harm" or "physical harm to persons" is defined as: "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). For purposes of menacing by stalking, the petitioner need not show that the respondent made an explicit or direct threat of physical harm. Instead, " 'the test is whether the (respondent), by engaging in a pattern of conduct, knowingly caused (the protected person) to believe (he) would cause physical harm to him or her.' " *J.S. v. Conkle*, 2024-Ohio-2330, ¶ 28 (7th Dist.), quoting *Holloway v. Parker*, 2013-Ohio-1940, ¶ 24 (3d Dist.).

**{¶70}** "Mental distress" is defined as:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

{¶71} A temporary incapacity is substantial if it significantly impacts the petitioner's daily life, and evidence of changed routine is pertinent. *Ramsey v. Pellicioni*, 2016-Ohio-558, ¶ 20 (7th Dist.). An inability to sleep or concentrate on work can qualify as a temporary substantial incapacity and can also constitute a condition that would normally require mental health services. *R.G. v. R.M.*, 2017-Ohio-8918, ¶ 17 (7th Dist.).

{¶72} Mental distress need not be incapacitating or debilitating to establish menacing by stalking under R.C. 2903.211. *Tabak*, 2022-Ohio-1123, at ¶ 9 (7th Dist.). Nonetheless, the definition of "mental distress" provides a "fairly stringent test," which is more than mere mental stress or annoyance. *A.M. v. Leone*, 2025-Ohio-728, ¶ 60 (7th Dist.).

{¶73} The trial court conceded Appellant did not make any direct threats of physical harm to Appellee.  Nonetheless, Appellee expressed an ongoing fear that Appellant would cause physical harm to her based on Appellant's possession of military-grade weapons, and Appellee's testimony that L.D. told her that Appellant "had pulled a gun out on [Appellee's] cousin . . . And just some of the things that [L.D.] told [Appellee] about [Appellant]." (Hrg. Tr., p. 11.)

{¶74} The trial court concluded Appellant engaged in a pattern of conduct to manipulate Appellee and assert authority and control over her.  Appellant disclosed Appellee's medical diagnosis to her colleagues and contact information to strangers without her knowledge.  Most importantly, Appellant continued to communicate with her after she insisted he cease any contact with her after July 30, 2024.

{¶75} When evaluating whether a decision is contrary to the manifest weight of the evidence, every reasonable presumption must be made in favor of the judgment. *Tabak*, 2022-Ohio-1123, at ¶ 6 (7th Dist.).  Based on the definition of "pattern of conduct" in Ohio," two or more actions or instances closely related in time," the electronic mails sent by Appellant to Appellee over the course of a few days in August, after she had insisted that communication between the parties must cease on July 30, 2024 is sufficient to establish a pattern.

{¶76} In addition to Appellant's electronic mails, other evidence in the record establishes Appellant refused to comply with or even acknowledge Appellee's demand to cease all communications unrelated to legal issues. According to Appellant's testimony

at the hearing, his relationship with Appellee is "still okay." (Hrg. Tr., p. 47.) Moreover, Appellant attempted to revise history when he testified it was he who initiated a *temporary* suspension of their relationship based on her failure to comply with her financial obligations.

**{¶77}** Given Appellee's ultimatum that communication between the parties must cease at the end of July, and her testimony that she repeatedly informed Appellant that his comments during their relationship were upsetting to her, she has established Appellant acted knowingly when he continued communications beyond the July deadline. In other words, Appellee established Appellant was aware his conduct would probably cause mental distress to Appellee or to cause Appellee to believe that he would cause her mental distress through future communications.

**{¶78}** Finally, Appellee testified "there were a lot of moments where [she] cried" because Appellant's disclosure of her medical diagnosis "made [her] start doubting [herself] in a lot of situations." (*Id.* at p. 46.) She further testified Appellant shared her medical diagnosis with colleagues and her contact information with strangers without her knowledge. Therefore, Appellee's testimony established Appellant's continued communications caused her more than mere mental stress or annoyance.

**{¶79}** It is axiomatic that the magistrate as the finder of fact is the arbiter of the parties' credibility. There is a presumption in favor of the trier of fact, to whom reviewing courts must defer in part because of their superior position from which to view the demeanor, gestures, and voice inflections of the witnesses in order to assess credibility. *In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (construing the evidence consistent with the judgment when susceptible to more than one construction).

**{¶80}** Based on the testimony offered at the hearing, the magistrate concluded Appellant was controlling, verbally abusive, and made inappropriate sexual comments and veiled threats regarding weapons in his possession to Appellee. Throughout their relationship, Appellee consistently informed Appellant that his behavior was upsetting her. When Appellee insisted communication cease between the parties on July 30, 2024, Appellant ignored her instruction and continued the very behavior that Appellee had clearly expressed was upsetting to her during their relationship. Accordingly, we find the

trial court's issuance of the CSPO is supported by the manifest weight of the evidence and Appellant's second assignment of error is without merit.

## CONCLUSION

**{¶81}** For the foregoing reasons, the July 11, 2025 entry of a Civil Stalking Protection Order ("CSPO"), pursuant to R.C. 2903.214, is affirmed.

Waite, P.J., concurs.

Robb, J., concurs.

Case No. 25 MA 0089

———————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**